### MILLERS *vs.* THE CITY COUNCIL OF AUGUSTA.

1. Though the corporation of Augusta, as proprietor of the Augusta canal, be not bound by express contract to supply a given head of water to a particular mill, nor to abstain from making alterations in the canal which will reduce the fall at such mill and impede or obstruct the accustomed action of its wheels by backwater, yet, the corporation cannot capriciously and without just cause withhold a due supply of water, nor can it make alterations in the canal injurious to the efficient working of the particular mill, unless they are needful and proper alterations, and consistent with sound principles as applied to the nature of the enterprise and to the business relations and circumstances of the corporation towards the various mills and manufacturing establishments situated along the canal and deriving water-supply therefrom.
2. There was enough evidence submitted by the complainants to make it proper for the jury to pass upon its sufficiency.

Municipal corporations. Canals. Non-suit. Before Judge SNEAD. Richmond Superior Court. April Term, 1879.

The complainants brought their bill, alleging that the City Council of Augusta, by an ordinance passed March 15, 1845, and by a supplemental ordinance passed July 7, 1845, provided for the construction of a canal for "manufacturing and other purposes," from Bull Sluice, on the Savannah river, into the city of Augusta, and on December 27, 1845, upon application, received from the general assembly an act

of incorporation, whereby the said City Council and others contributing to the expense of constructing said canal, and their assigns, were made a body corporate under the name of the "Augusta Canal Company," with "power in the name and behalf of the said company, to make all contracts, and for the use of the water of the same for manufacturing and other purposes." That on March 2, 1852, the City Council of Augusta, being the owners thereof, and in order to utilize the water from said canal, and by water rentals therefrom to reimburse themselves for the cost of its construction, bargained to one Ogleby a certain lot of land on the line of said canal, between the second and third levels thereof, for the purpose of building and maintaining thereon a manufactory of cotton gins, etc., the machinery of which was to be driven by water from said canal, which, with the consent of defendant, was transferred to T. J. Cheely, and a bond for title executed therefor to said Cheely, who proceeded to erect said manufactory upon said lot, and to construct the necessary appurtenances thereto, in the shape of a forbay, flume, pen-stock and waste-weir for the application to and use of water from said canal by said mill. That afterwards, on February 1, 1855, a contract for the use of water from said canal by said mill, was duly executed between said Canal Company and said Cheely, for the term of five years, wherein said Cheely was bound to "have said mill and machinery in full operation by the first day of June next (1855), and that if said mill and machinery is not in full operation by that time, the water rent shall then begin and become due and payable as above mentioned." That said Cheely having failed to pay for said lot of land, the said City Council afterwards, on August 5, 1856, conveyed the same (with others in said deed described lying next thereto) to James Brown, "together with all and singular the rights, members and appurtenances thereof whatsoever, to the said lot or parcel of land, or in anywise appertaining, and the remainders, reversions, rents, issues, and profits thereof, and every part thereof, to have and to hold,

etc," said mill being then built and in receipt of water from said canal. That at the date of the contract, the building of the mill, and from the construction of said canal, until the acts complained of, the head and fall of water, or difference between the surface of water in the second and third levels of said canal was thirteen feet. That the flumes, pen-stocks, waste-weir, and all other necessary contrivances to carry water from said second level of the canal to said mill upon and through said land to the third level of said canal, which, together with the right to use said water therefrom, as provided in said contract, until its expiration, and thence forward as might be agreed upon as necessary to the use of said mill, was an appurtenance, right and member appertaining and belonging to said land, and passed to the said James Brown and his assigns under the aforesaid deed. That as contemplated by said sale and purchase, said lot of land, with the additions made thereto by purchases from time to time from said City Council, and the contract for the use of water thereon, have ever since been used for the purposes of manufacturing. That in 18— said mill was converted into flour-mills, and have been from time to time enlarged with the knowledge and acquiescence of said City Council and Canal Company, and said Canal Company and City Council have continued to furnish water for their use and operation as required, and received pay therefor. That in 187-, with the knowledge and acquiescence of said parties, R. F. Urquhart, the then owner, enlarged the flumes, pen-stocks, waste-weir, and other appurtenances for receiving water from said canal by said mills, and constructed them upon their present plan, and said parties thenceforward furnished the requisite supply of water through the same, without objection. In 1874, complainants bought said lot of land, with the mills and appurtenances thereon, under a regular chain of title from said City Council, for $16,500, at which time said mills were receiving the necessary supply of water to run the same at the original head and fall of thirteen feet.

That shortly after their purchase, with the full knowledge and acquiescence of the Canal Company, and relying on the original and then existing head and fall of water at said mills of thirteen feet, in order to complete the facilities and conveniences of said mills, and to make them first-class throughout for the manufacture of superior grades of flour, meal, etc., and to utilize the volume of water then passing through said mills, complainants, at a further expense of $20,000, thoroughly overhauled the mill buildings, taking out the old wheels and machinery and putting in new and the most improved wheels and machinery, and erected a store-room or warehouse for the products thereof. That upon the completion of those improvements, and the starting of the mills, the supply of water theretofore furnished and then existing, was found most ample and abundant, and which continued to be abundant so long as the said head and fall of thirteen feet was preserved. That on January 1, 1875, complainants bought of defendant the adjoining lot of land, and added to said mill-tract at a further cost of $500 ; that in 18 í7,the canal and all appurtenances was conveyed by the Augusta Canal Company to the City Council of Augusta, and said City Council was thereby formally vested "with all the power, authority and privileges conferred on said company by the act incorporating it, and shall be subject to all the liabilities therein prescribed." That prior thereto the said City Council enlarged said canal, on its first level, from its former capacity of 700 horse power to 1400 horse power, which greatly increased the volume of water which was applied to the mills on said first level, with race-ways emptying therefrom into the second and third levels, and which, since said enlargement, have been permitted to use 2 34-100 times more water than before, to say nothing of the great waste of water through their connections and appurtenances. That no enlargement was made of the second and third levels, so that this greatly increased volume of water could be received and discharged by these levels— (being fully three times the amount they were built to

receive)—the inevitable result of which was to raise the surfaces thereof and to reduce the head and fall as previously fixed. That owing to the favorable location of complainants' mill, on the extreme eastern end of the second level, and remote from the race-ways of the mills on the first level, with the exception of the sluggish flow of the water in the third level east of Marbury street wasteway from the discharge of this increased volume of water from the first and second levels through this wasteway, complainants had escaped much of the evil resulting from the failure to proportionately enlarge the second and third levels, until March, 1877, when the said City Council, under pretext of facilitating the flow of water to the eastern end of the second level, and thereby washing out mud accumulations therein (the real purpose and design being by a reduction of the surface of the second level to relieve mill No. 2, of the Augusta factory of back-water caused by the use of said mill of double the quantity of water without enlarging its race-way), constructed near the mill of complainants a wasteway from the second to the third level of said canal, and within forty feet of the flume of their mill, and so arranged below the surface of the said second level as to cause the water to flow over the same to the depth of four inches, and to reduce the surface of the second level (as existing prior to the construction of this waste-way) 1 57-100 feet, and to raise the surface of the second level two feet, thus reducing the head and fall between said levels from thirteen feet to nine and a half feet. That said new waste-way is a perversion of the original plan of said canal as it existed from its construction in 1847 to 1877. That the natural and original waste-way between said levels is at Marbury street near the Augusta factory. That the new one near the mills of complainants was built under the advice and direction of P. S. Holden, who, besides being the superintendent of said canal, is the employee as engineer and— of the Augusta factory, and by whom the wheels in said mill No. 2, and their water-appurtenances were put in posi-

tion and remain under his control—that the purpose named and pretext given for the construction of said new waste-way are ridiculous—that it cannot possibly work any such result, but the contrary, and its construction is the result of over zeal upon the part of Holden, who is enabled by his position to favor the factory at the expense of the other water-tenants of the canal, and whose rights are, in many respects, antagonistic to the factory, whose employee he is. That the members of the City Council are without knowledge or experience in the maintenance and supervision of a great water-power like the canal, and have of necessity to rely upon and be governed by the opinions of their said superintendent and engineer, to which fact is largely due the failure of complainants to secure redress of their grievances.

That as soon as the ruinous consequences of this waste-way were disclosed, complainants thought it only necessary to bring the matter to the attention of defendant to have it remedied, in which reasonable expectation they were disappointed, as their complaints and protests were wholly fruitless; that just prior to the bringing of this bill, upon renewing their protest against the ruin of their property by a course not only perversive of the original plan of the canal, but had and continued in the interest of one tenant against another, thereby discriminating among tenants entitled to equal rights, and the same enjoyment of the use of property constructed and authorized for the equal and just use and enjoyment of the public, without so much as a respectful hearing or inquiry into the complaint of the complainants, they were informed that said waste-way had been built to wash out the canal; whereupon complainants proposed, if such was the real purpose, and would be so used, that it would not and could not greatly injure complainants, and that if defendant would restore the head and fall by raising the lip of the waste-way for that purpose, that complainants would make no objection to it and its use for washing out said levels—which proposition was declined,

and defendant then urged that complainants had no rights in the premises, as they had no contract for water from said canal in writing, and the verbal agreement for the use of the same was not binding, and that neither the purchase of said lots along said canal from said City Council for the purpose of building and operating mills thereon to be run by water from said canal, and the conveyance thereof by council with the appurtenances to and the use of water by said mill, the large expenditure of money in improving and enlarging said mills upon the faith of the then water supply, nor the fact of having received water from said canal for said mills and the payment therefor for over twenty years, gave them any rights in the premises; and that unless complainants would forego their aforesaid grievances and apply for a new contract for the use of water by said mills under the changed status of said head and fall of water, that said City Council would cut off said water entirely from said mills, which threat complainants are satisfied defendant will carry into execution if not restrained. That the effect of the said waste-way in reducing the head and fall has so reduced the power of the mills as to decrease their production more than one-half, the product being before 75 barrels of flour and 600 bushels of meal, and since 35 barrels of flour and 300 bushels of meal per day. That said waste-way, as now used, is wholly unnecessary to any intelligent or legitimate purpose in the management of said canal, and is not needful or necessary to the full enjoyment of any right or interest claimed by any person or corporation using water from the same; that its construction and use is a departure from the plan of said canal and an injury thereto —that the Marbury street waste-way is the original and natural outlet for the water from the second to the third levels, and is ample for said purpose, and does not injure any one, as the mills were built with reference thereto.

The prayer of the bill is for injunction to prevent the execution of the threat to cut off water, and especially to enjoin the use of said waste-way to reduce the head and fall of water

between the second and third levels as theretofore existing,. and for damages for injury done thereby, and general relief.

Complainants made by their testimony substantially the case presented by their bill. At the conclusion of their evidence the court, on motion of defendant, ordered as follows:

"According to my view of the facts presented in evidence, in order to charge the city it must be proven that the complainants had a contract with the city; I have looked in vain to see any contract granting to complainants this water-power they claim. In looking into the deed it only conveys land and improvements, but that deed does not include any water-power. That was outside, that was to be fixed afterwards by the contract. My decision is that there is no evidence showing a contract with the city or a breach of such contract. I therefore award a non-suit."

To this judgment complainants excepted.

H. CLAY FOSTER; JOHN T. SHEWMAKE, for plaintiffs in error, cited as follows : On authority to non-suit, 55 *Ga.*, 433 ; 60 *Ib.*, 627 ; 8 Reporter, 290 ; 10 Wall., 655 ; 3 Clif., 206; 9 Otto, 645. "Appurtenances" covers whatever grantor has power to grant, Ang. on Water Courses, 270, note §158 ; High on Inj., 314, 315, §563 ; 4 Gray, 143, 378 ; 2, Metc., 234 ; 11 Allen, 388 ; 10 Maine, 224 ; 13 *Ib.*, 289 ; 17 *Ib.*, 281 ; 5 Wend., 523 ; 4 McCord, 96; 18 N. Y., 109 ; 12 Ad. & Ell., 57 ; Kerr on Inj., §355 ; 3 Hump., 181 ; 1 Serg. & R., 173 ; 5 *Ib.*, 107 ; 10 *Ib.*, 63 ; 43 Ill., 71 ; 43 Vermont, 9 ; 23 *Ib.*, 681 ; 37 *Ib.*, 312 ; 2 Caine's Cases, 87 ; 7 Mass., 6 ; 3 Mass. C. C., 280 ; Wood on Nuisance, 441; 452 *et seq.;* 4 Barr., 353 ; 58 *Ga.*, 268 ; 1 Shep. Touch., 89 , 4 Ohio, 288, 441. Estoppel by acquiescence, Kerr on Inj., 42, §§13, 496 ; 4 L. & E. Rep'r, 645; 41 *Ga.*, 162 ; Washburn on Easements, 97 ; High on Inj., 313, §559. Easement, what constitutes, Ang. on W., 272 ; 37 Vermont, 304,. 312 ; 43 *Ib.*, 9 ; 8 Gray, 621 ; 4 Allen, 393. In absence of special custom, artificial water-courses are not distinguished

49

from natural ones, Ang. on W., §§206, 141, note 4, p. 205 ; Wood on Nuisances, 424, 439 ; 12 N. Y., 381 ; 21 *Ib.*, 505 ; 2 Kern., 381 ; 24 N. H., 506 ; 3 *Ib.*, 190 ; 21 Pick., 342 ; 5 Metc., 238 ; 11 *Ib.*, 281 ; 23 Vermont, 681 ; 39 E. C. L., 169 ; 3 Kent's Com., 442, and note ; Washb. on E. & S., 402 ; 12 Allen, 518. Municipal corporation exercising franchise conferred by special grant, as to construct and operate a railroad, it occupies position of private corporation. Cooley's Con. Lim., 250 *et seq.* ; 5 N. Y., 369 ; 3 Am. R., 487 ; 9 Am. L. T. R., 484 ; 2 Waite's Actions and Def., 321 ; 12 Wheat., 40 ; 18 *Ga.*, 97 ; 54 *Ib.*, 642. Corporation chartered for particular purpose has not same absolute right over property as individual. Ang. & Ames on Corp., 233, §256 ; 7 Rep'r, 226 ; 12 Am. R., 463 ; 13 *Ib.*, 462 ; 14 *Ib.*, 682 ; Field on Corp., §41 ; 36 N. J., 407 ; 13 *Ib.*, 72 ; 52 N. H., 430 ; 18 *Ib.*, 756 ; 8 Vroom, 531 ; 6 How., 344, 372 ; 7 N. H., 157 ; 51 *Ib.*, 9 ; 19 Wend., 234 ; 44 Mo., 547 ; 38 *Ga.*, 608 ; 4 Ohio, 294. City as holder of special franchise, liable for damages. 3 Pick., 473 ; 102 Mass., 489 ; 16 N. Y., 161 ; 1 Black, 39 ; 2 *Ib.*, 590 ; 36 N. H., 289, 294 ; 14 Gray, 543 ; 4 Allen, 41, 51 ; 3 Hill, 531 ; 22 Penn., 54 ; 5 Bing., 91 ; 3 B. & Ad., 77 ; 11 H. L. & C., 687.

W. H. & T. H. GIBSON, for defendant, cited 10 Peters, 25, 54 ; Bouv. Law Dict., "appurtenances ;" Angell on W., 13, 141, 153, 163 ; 21 Pick., 431 ; 5 Metc., 429 ; 8 Cent. L. J., 225 ; 1 Dillon, 55, 353 ; 2 *Ib.*, 519, 753.

BLECKLEY, Justice.

1. From the act of incorporation and other legislation touching the Augusta canal, together with the record of this case, it may be collected that the canal was constructed for manufacturing as well as other purposes ; that a *prime object* was to encourage the building of mills and factories along its banks for the sake of the water-power it affords ; that in putting and keeping it before the public, an invita-

tion was extended to capital to come forward and embrace its advantages as a manufacturing site; and that, from time to time, establishments have grown up which are wholly dependent upon it for water to work them and keep their machinery in motion. The canal is the property of the city of Augusta, and the mill and factory establishments. belong severally to the various individuals or companies. There is thus a water-supply owned by the city, and, recip-rocally, a water-demand on the part of those who have invested their capital in buildings and machinery contigu-ous to the canal.

In the case of each establishment, the fall and water-head appropriate to it had to be foreseen when it was erected; and on or before its going into operation, an adjustment of its fixtures and machinery had to take place to the then condition of the canal, so as to fit it for receiving and ap-plying the water. This involved expense, and any material change of the canal thereafter, requiring a new adjustment, would, of course, involve further expense. Indeed, it might be possible to make changes in the canal on a scale which would work ruin to one or more of the establish ments, whilst others of them, perhaps, would be greatly benefited. Again, it is essential that all reasonable expecta-tions of a continuous and regular supply of water, on pay-ment of the established water-rents or rates of compensation, should be met, and none disappointed. Each mill or factory is dependent for profitable working upon drawing from the canal as much water as it needs, and when it needs it. The city keeps a water-market, so to speak, and the patrons of the canal have repaired to that market, and at great expense put themselves in a situation to use the water. In the na-ture of things the doing of this has brought them into cir-cumstances where they must have it or sustain heavy loss for the want of it. Between them and the city are special relations which do not hold between the ordinary proprie-tors of adjacent property. Generally, one man is not obliged to let or sell to another what he owns, or allow him the use

of it; but there are certain *quasi* public occupations in which there is an implied undertaking on the part of those who engage in them to serve, so far as they reasonably can, all comers. The keeper of an inn must receive and entertain guests; the keeper of a toll-bridge or ferry must suffer travelers to cross; a common carrier must allow them seats in his vehicle; and the keeper of a custom-mill must grind for all who bring their grain and offer it for the purpose. So, we think, the owner of a canal constructed in part for manufacturing purposes and afterwards held out as a source of water-supply, must, after expensive machinery has been set up along its banks, on the faith of obtaining the needed supply, furnish each and every establishment a sufficiency of water, if to do so be reasonably in its power, and if the customer is willing to pay and offers to pay at the usual rate. This duty, in the case of the Augusta canal, holds good whether there is any express contract between the parties or not. Doubtless, under the terms of the charter, those patrons who make express contracts, and renew them from time to time, would have the preference, so that if any have to be disappointed for want of means to serve all, the non-contracting patrons would be the sole sufferers. It may also be true that to save trouble and expense of frequent settlements, and to remove all risk of failing to collect past dues, weekly, monthly, or quarterly payments in advance might be exacted. Counsel for the city contended in argument, as the court below seems to have ruled at the trial, that in the absence of actual contract to furnish water to the mill of plaintiffs, no obligation to furnish it would exist; and for this position the following language of the charter was cited (the city having under subsequent legislation succeeded to all the power, authority and privileges of the original canal company): "That the said managers, for the time being, shall have full power, in the name and behalf of the said company, to make all contracts . . . for the use of the water of the same for manufacturing or other purposes, and to impose and collect

such proportionate assessments upon the individual stockholders of said company as may be required . . . for the payment of any damage sustained by manufacturers and others from a failure to supply them with water, according to such contracts." "That the board of managers for the time being shall have power to make and enforce such rules and regulations in relation to the use of said canal and its waters, for navigation or other purposes, and to impose and collect such tolls, rent or other charges as they may deem equitable or expedient, and which do not interfere with any of the existing contracts or obligations of said company." We cannot bring our minds to the conclusion that these clauses, or any others in the charter, were intended to enable the company to force its patrons into express contracts, and measure its duty to furnish water solely and exclusively by agreements of that character. Such a construction would render it optional with the company to furnish for a time and then cease, or to supply one and not another, though having means to supply all; for there is no provision in the charter for obliging the company or the managers to contract with anybody, or to renew expired contracts. If, therefore, there is no duty independently of express contract, to furnish water, those who need it after preparing to use it might get it or not, according as the company might or might not choose to incur a special voluntary obligation in the particular instance, to supply it. If a statute were passed giving inn-keepers, toll-bridge keepers, ferrymen, common carriers, and millers the power to establish their own rates, and make all contracts in their business, it surely would not follow that they could turn away customers who offered to pay cash at regular rates, merely because no previous express contract had been entered into. No doubt the canal company, acting in good faith, could lawfully engage all its available water to those of its customers first applying, and first stipulating by express contract to take it and pay for it; just as an inn may be filled by the first arrivals, and re-

main full as long as these choose to stay; but this is quite a different matter from refusing capriciously and without just cause to furnish water that customers need and apply for, and which is pre-engaged to none.

The counsel urged, also, certain provisions of the charter, or of the amendment thereto, supposed to bear on the other element of the case, namely, on the alleged injury to the mill of the plaintiffs consequent upon alterations made or contemplated in the canal. These provisions give power to the company, or to the city, its successor, to enlarge the canal by widening and deepening the same; to make basins or reservoirs; to construct a branch canal or branch canals leading from one part of the main line to another, or to the Savannah river; and to construct acqueducts, tow-paths, dams, waste-weirs, race-weirs, or other structures to improve or make available the canal and its branches for manufacturing purposes. The power here conferred is very broad, but we cannot construe it as authorizing all manner of changes and alterations at the mere will of the corporation, irrespective of their effect upon investments in buildings and machinery once properly erected, and to which water has for a time been supplied. It is a general rule of law that no one can so use his own property as to damage that of others, and the reason of the rule extends to corporations with the same force as to natural persons. All the authorized acts just enumerated might be done by a private individual in respect to a ditch or canal wholly on his own land without any special grant, and still if he did them, and in such a manner as to back water upon his neighbor's mill, or otherwise interfere with its efficient working, he would have to answer in damages. There is this much of restraint where only ordinary relations subsist between two or more parcels of adjacent property; but we have already signified that between the Augusta canal and the mills and factories situate upon it there is a much more intimate relation than between contiguous estates in general. Relatively to manufacturing enterprises they constitute one sys-

tem of means. To work out the purposes to which they have been devoted, it is necessary that they be and remain balanced and harmonized in their use; co-operative, not antagonistic or independent, action must be the order of their movement. The canal and all the establishments deriving from it their supply of water are tied together and constitute a kind of special business community. In considering what changes could properly be made in the canal, the inquiry should be whether the particular change in question was needful and could be made consistently with sound principles as applied to the nature of the general enterprise, and to the business relations and circumstances of the corporation toward the various mills and factories as a whole. Perhaps, a useful point of view would be to contemplate the entire outfit, embracing the canal and the aggregate investment in mills and factories, as one great trust property, with different beneficiaries interested in different parts of it, and, supposing it to be committed to one and the same board of trustees, let the question be whether this or that alteration in the canal could be made without a breach of trust toward some one or more of the beneficiaries, or, on the other hand, whether it could be omitted without a failure of duty to others. When various persons embark their capital together, each retaining a several ownership in his own, and a separate control of its management, none are to be injured without an adequate reason for it in the fair and judicious prosecution of the general scheme, and with such reason, those who happen to suffer must submit to the sacrifice. The presence or absence of such reason in any given instance is generally a question of fact, and it is so in this case.

2. Not expressing or intimating any opinion, further than that there was evidence enough to carry the case to the jury, we hold that the order non-suiting the plaintiffs was erroneous.

Judgment reversed.